Justice Scalia,
with whom The Chief Justice and Justice O’Connor join, and with whom Justice Thomas joins as to Part I-A,
dissenting.
I respectfully dissent. The plurality correctly recognizes that Congress must clearly express its intent to apply its laws to foreign-flag ships when those laws interfere with the ship’s internal order. Its attempt to place Title III of the Americans with Disabilities Act of 1990 (ADA) outside this rule through creative statutory interpretation and piecemeal application of its provisions is unsupported by our case law. Title III plainly affects the internal order of foreign-flag cruise ships, subjecting them to the possibility of conflicting international obligations. I would hold that, since there is no clear statement of coverage, Title III does not apply to foreign-flag cruise ships.
I
A
As the plurality explains, where a law would interfere with the regulation of a ship’s internal order, we require a clear statement that Congress intended such a result. See *150 ante, at 130. This rule is predicated on the “rule of international law that the law of the flag state ordinarily governs the internal affairs of a ship,” McCulloch v. Sociedad Nacional de Marineros de Honduras, 372 U. S. 10, 21 (1963), and is designed to avoid “the possibilit[y] of international discord,” Benz v. Compania Naviera Hidalgo, S. A., 353 U. S. 138, 147 (1957); see also McCulloch, supra, at 19.
The clear-statement rule finds support not only in Benz and McCulloch, but in cases like Cunard S. S. Co. v. Mellon, 262 U. S. 100, 128-129 (1923), where we held that the National Prohibition Act, 41 Stat. 305, forbade foreign-flag ships from carrying or serving alcohol in United States territorial waters. Though we did not say so expressly in that case, prohibiting the carrying and serving of alcohol in United States waters cannot be said to affect the “internal order” of the ship, because it does not in any way affect the operation or functioning of the craft.[1] Similarly, in Lauritzen v. Larsen, 345 U. S. 571 (1953), and Hellenic Lines Ltd. v. Rhoditis, 398 U. S. 306 (1970), we did not employ a clear-statement rule in determining whether foreign seamen injured aboard foreign-flag ships could recover under the Jones Act, 41 Stat. 1007, 46 U. S. C. App. §688. We distinguished these cases in McCulloch, explaining that a clear statement is not required “in different contexts, such as the Jones Act ... where the pervasive regulation of the internal order of a ship may not be present.” 372 U. S., at 19, n. 9 (emphasis added).[2]
*151 As the plurality concedes, ante, at 134, the structural modifications that Title III of the ADA requires under its barrier-removal provisions, see 42 U. S. C. §§ 12182(b)(2) (A)(iv), 12184(b)(2)(C), would plainly affect the ship’s “internal order.” Rendering exterior cabins handicapped accessible, changing the levels of coamings, and adding public restrooms — the types of modifications petitioners request— would require alteration of core physical aspects of the ship, some of which relate to safety. (Safety has, under international law, traditionally been the province of a ship’s flag state.) This is quite different from prohibiting alcohol in United States waters or imposing tort liability for injuries sustained on foreign ships in port — the laws at issue in Cu-nará and the Jones Act cases. Those restrictions affected the ship only in limited circumstances, and in ways ancillary to its operation at sea. A ship’s design and construction, by contrast, are at least as integral to the ship’s operation and functioning as the bargaining relationship between shipowner and crew at issue in Benz and McCulloch.
Moreover, the structural changes petitioners request would be permanent. Whereas a ship precluded from serving or carrying alcohol in United States waters may certainly carry and serve alcohol on its next trip from Italy to Greece, structural modifications made to comply with American laws cannot readily be removed once the ship leaves our waters and ceases to carry American passengers. This is again much like the situation presented in Benz and McCul-loch, where the application of American labor laws would have continued to govern contracts between foreign shipowners and their foreign crews well beyond their time in our waters.
The purpose of the “internal order” elear-statement requirement is to avoid casually subjecting oceangoing vessels to laws that pose obvious risks of conflict with the laws of the *152 ship’s flag state, the laws of other nations, and international obligations to which the vessels are subject. That structural modifications required under Title III qualify as matters of “internal order” is confirmed by the fact that they may already conflict with the International Convention for the Safety of Life at Sea (SOLAS), Nov. 1,1974, [1979-1980] 32 U. S. T. 47, T. I. A. S. No. 9700. That treaty, which establishes the safety standards governing the design and maintenance of oceangoing ships, has been ratified by 155 countries. See International Maritime Organization, Summary of Status of Conventions, http://www.imo.org/Conventions/ mainframe.asp?topic_id=247 (all Internet materials as visited June 2,2005, and available in Clerk of Court’s case file). The ADA Accessibility Guidelines (ADAAG) Review Advisory Committee — the Government body Congress has charged with formulating the Title III barrier-removal guidelines— has promulgated rules requiring at least one accessible means of egress to be an elevator, whereas SOLAS, which requires at least two means of escape, does not allow elevators to be one of them. See Passenger Vessel Access Advisory Committee, Final Report: Recommendations for Accessibility Guidelines for Passenger Vehicles, ch. 13, pt. I (Dec. 2000), http://www.access-board.gov/news/pvaac-rept.htm (hereinafter PVAAC Report) (explaining potential conflicts between ADAAG regulations and SOLAS). The ADAAG rules set coaming heights for doors required to be accessible at one-half inch; SOLAS sets coaming heights for some exterior doors at three to six inches to ensure that those doors will be watertight. Ibid.
Similar inconsistencies may exist between Title Ill’s structural requirements and the disability laws of other countries. The United Kingdom, for example, is considering the promulgation of rules to govern handicapped accessibility to passenger vehicles, including cruise ships. The rules being considered currently include exact specifications, down to the centimeter, for the height of handrails, beds, and elec *153 trical switches, and the width of door openings. See Disabled Persons Transport Advisory Committee, The design of large passenger ships and passenger infrastructure: Guidance on meeting the needs of disabled people (Nov. 2000), http://www.dptac.gov.uk/pubs/guideship/pdf/dptacbroch.pdf. Though many of these regulations may be compatible with Title III, it is easy to imagine conflicts arising, given the detailed nature of ADAAG’s regulations. See PVAAC Report, chs. 1-11. As we have previously noted, even this “possibility of international discord” with regard to a seagoing vessel’s internal order, McCulloch, 372 U. S., at 21 (emphasis added), gives rise to the presumption of noncover-age absent clear statement to the contrary.
The Court asserts that Title III would not produce conflicts with the requirements of SOLAS and would not compromise safety concerns. This argument comes at the expense of an expansive en passant interpretation of the exceptions to the barrier-removal requirements of Title III — which interpretation will likely have more significant nationwide effects than the Court’s holding concerning Title Ill’s application to foreign-flag vessels. Assuming, however, that the argument is even correct,[3] it is entirely beside the point. It has never been a condition for application of the foreign-flag clear-statement rule that an actual conflict with foreign or international law be established — any more than that has been a condition for application of the clear-statement rule regarding extraterritorial effect of congres *154 sional enactments. The reason to apply the rule here is that the structure of a ship pertains to the ship’s internal order, which is a matter presumably left to the flag state unless Congress indicates otherwise. The basis for that presumption of congressional intent is principally (though perhaps not exclusively) that subjecting such matters to the commands of various jurisdictions raises the possibility (not necessarily the certainty) of conflict among jurisdictions and with international treaties. Even if the Court could, by an imaginative interpretation of Title III, demonstrate that in this particular instance there would be no conflict with the laws of other nations or with international treaties,[4] it would remain true that a ship’s structure is preeminently part of its internal order; and it would remain true that subjecting ship structure to multiple national requirements invites conflict. That is what triggers application of the clear-statement rule.
Safety concerns — and specifically safety as related to ship structure — are traditionally the responsibility of the flag state. Which is to say they are regarded as part of the ship’s internal order. And even if Title III makes ample provision for a safety exception to the barrier-removal requirements, what it considers necessary for safety is not necessarily what other nations or international treaties consider necessary.
The foregoing renders quite unnecessary the Court’s worry that Title III might require American cruise ships to adhere to Congress’s prescription in violation of SOLAS. See ante, at 135-136. If and when that possibility presents itself, the Court remains free to do what it does here: to interpret Title III so as to avoid any conflict. But the avail *155 ability of such an interpretation has no bearing upon whether the structural features of an oceangoing vessel are part of its internal order. (I must observe, however, that it seems much more plausible that Congress intended to require American cruise ships to adhere to Title III regardless of SOLAS, than that — what the Court apparently believes— Congress intended Title III to be interpreted with an eye to SOLAS.) In any event, the application of Title III to oceangoing vessels under American flag is not at issue here. I would therefore hold that, because Title Ill’s barrier-removal provisions clearly have the possibility of subjecting foreign-flag ships to conflicting international obligations, no reading of Title III — no matter how creative — can alter the presumption that Title III does not apply to foreign-flag ships without a clear statement from Congress.[5]
B
The plurality holds that, even “[i]f Title III did impose a duty that required [foreign-flag] cruise ships to make permanent and significant structural modifications^] or . . . otherwise interfered with a foreign ship’s internal affairs,... Title III requirements having nothing to do with internal affairs would continue to apply to domestic and foreign ships alike.” Ante, at 137-138. I disagree. Whether or not Title Ill’s prescriptions regarding such matters implicate the “internal order” of the ship, they still relate to the ships’ maritime operations and are part of the same Title III.[6] The requirements of that enactment either apply to foreign-flag ships or *156 they do not. It is not within our power to design a statute some of whose provisions apply to foreign-flag ships and other of whose provisions do not — any more than it is within our power to prescribe that the statute applies to foreign-flag cruise ships 60% of whose passengers are United States citizens and does not apply to other foreign-flag cruise ships.
The plurality’s assertion that those portions of Title III that do not implicate a ship’s internal order apply to foreign-flag ships displays a confusion between a principle of interpretation based upon a true-to-fact presumption of congressional intent, and a court-made rule. The plurality seems to forget that it is a matter of determining whether Congress in fact intended that its enactment cover foreign-flag ships. To believe that there was any such intent section-by-section and paragraph-by-paragraph is delusional. Either Congress enacted Title III only with domestic entities (and not foreign-flag ships) in mind, or it intended Title III to apply across-the-board. It could not possibly be the real congressional intent that foreign-flag cruise ships be considered “place[s] of public accommodation” or “specified public transportation” for purposes of certain provisions but not for others. That Congress had separate foreign-flag intent with respect to each requirement — and would presumably adopt a clear statement provision-by-provision — is utterly implausible. And far from its being the case that this creates “a trap for an unwary Congress,” ante, at 139, it is the plurality’s disposition that, in piecemeal fashion, applies to foreign-flag ships provisions never enacted with foreign-flag vessels in mind.[7] We recently addressed a similar question *157 in Clark v. Martinez, 543 U. S. 371 (2005), where we explained that a statutory provision must be interpreted consistently from case to case. “It is not at all unusual to give a statut[e] ... a limiting construction called for by one of the statute’s applications, even though other of the statute’s applications, standing alone, would not support the same limitation.” Id., at 380. That principle should apply here. Since some applications of Title III plainly affect the internal order of foreign-flag ships, the absence of a clear statement renders the statute inapplicable — even though some applications of the statute, if severed from the rest, would not require clear statement.
This does not mean that a clear statement is required whenever a court applies Title III to any entity — only that a clear statement is required to apply any part of Title III to foreign-flag ships. Raygor v. Regents of Univ. of Minn., 534 U. S. 533 (2002), and Jinks v. Richland County, 538 U. S. 456 (2003), do not dictate otherwise. Raygor held that 28 U. S. C. § 1367(d) does not include, in its tolling of the limitations period, claims against States, because it contains no clear statement that States are covered. Jinks held that § 1367(d)’s tolling provision does apply to claims against political subdivisions of States, because no clear-statement requirement applies to those entities. In other words, a clear statement is required to apply § 1367(d) to States, just as a clear statement is required to apply Title III to foreign-flag ships. A clear statement is not required to apply § 1367(d) to political subdivisions of States, just as a clear statement is not required to apply Title III to domestic ships or other domestic entities. The question in each of these cases is whether the statute at issue covers certain entities, not whether some provisions of a statute cover a given entity.
*158 The fine tuning of legislation that the plurality requires would be better left to Congress. To attempt it through the process of case-by-case adjudication is a recipe for endless litigation and confusion. The plurality’s resolution of today’s case proves the point. It requires this Title III claimant (and every other one who brings a claim against a foreign shipowner) to show that each particular remedy he seeks does not implicate the internal order of the ship. That showing, where structural modification is involved, would not only require the district court to determine what is “readily achievable,” ante, at 135-136 (majority opinion), and what would “pose ‘a significant risk to the health or safety of others,’” ante, at 136 (majority opinion) (quoting § 12182(b)(3)), but would also require it to determine the obligations imposed by foreign law and international treaties.[8] All this to establish the preliminary point that Title III applies and the claim can proceed to adjudication. If Congress desires to impose this time-consuming and intricate process, it is certainly able to do so — though I think it would likely prefer some more manageable solution.[9] But for the plural *159 ity to impose it as a novel consequence of the venerable clear-statement rule seems to me unreasonable. I would therefore decline to apply all of Title III to foreign-flag ships without a clear statement from Congress.
II
As the Court appears to concede, neither the “public accommodation” provision nor the “specified public transportation” provision of Title III clearly covers foreign-flag cruise ships. The former prohibits discrimination “on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation.” 42 U. S. C. § 12182(a). Though Congress gave a seemingly exhaustive list of entities constituting “public accommodation[s]” — including inns, hotels, restaurants, theaters, banks, zoos, and laundromats — it failed to mention ships, much less foreign-flag ships. See § 12181(7). Particularly where Congress has provided such detailed specification, this is not a clear statement that foreign-flag ships are covered. Petitioners also claim that, because cruise ships are essentially floating hotels that contain restaurants and other facilities explicitly named in § 12181(7), they should be covered. While this may support the argument that cruise ships are “public accommodations,” it does not support the position that Congress intended to reach foreign-flag cruise ships.
The “specified public transportation” provision prohibits discrimination on the basis of disability “in the full and equal *160 enjoyment of specified public transportation services provided by a private entity that is primarily engaged in the business of transporting people and whose operations affect commerce.” § 12184(a). The definition of “specified public transportation” includes “transportation by bus, rail, or any other conveyance (other than by aircraft) that provides the general public with general or special service (including charter service) on a regular and continuing basis.” § 12181(10). “[A]ny other conveyance” clearly covers ships. But even if the statute specifically mentioned ships, that would not be a clear statement that foreign-flag ships are included — any more than the reference to “employer” in the NLRA constituted a clear statement that foreign-flag ship employers were covered, see McCulloch, 372 U. S., at 19-21.
Title III of the ADA stands in contrast to other statutes in which Congress has made clear its intent to extend its laws to foreign ships. For example, the Maritime Drug Law Enforcement Act, 94 Stat. 1159, 46 U. S. C. App. § 1901 et seq., which permits the inspection and apprehension of vessels suspected of possessing controlled substances, applies to “vessel[s] subject to the jurisdiction of the United States,” § 1903(a), which includes vessels “located within the customs waters of the United States,” § 1903(e)(1)(D), and “vessels] registered in a foreign nation where the flag nation has consented or waived objection” to United States jurisdiction, § 1903(c)(1)(C). Section 5 of the Johnson Act, 64 Stat, 1135, as amended, 106 Stat. 61,15 U. S. C. § 1175(a), restricts the use of gambling devices “on a vessel . . . documented under the laws of a foreign country.” See also 14 U. S. C. § 89(a) (Coast Guard may engage in searches on “waters over which the United States has jurisdiction” of “any vessel subject to the jurisdiction, or to the operation of any law, of the United States”); 18 U. S. C. §2274 (making it unlawful for “the owner, master or person in charge or command of any private vessel, foreign or domestic . . . within the territorial waters of the United States” willfully to cause or *161 permit the destruction or injury of their vessel in certain circumstances).
That the Department of Justice and the Department of Transportation — the executive agencies charged with enforcing the ADA — appear to have concluded that Congress intended Title III to apply to foreign-flag cruise ships does not change my view. We “accept only those agency interpretations that are reasonable in light of the principles of construction courts normally employ.” ARAMCO, 499 U. S. 244, 260 (1991) (Scalia, J., concurring in part and concurring in judgment) (declining to adopt the Equal Employment Opportunity Commission’s determination that Title VII applied to employers abroad); see also id., at 257-258 (opinion of the Court) (same). In light of our longstanding clear-statement rule, it is not reasonable to apply Title III here.
I would therefore affirm the Fifth Circuit’s judgment that Title III of the ADA does not apply to foreign-flag cruise ships in United States territorial waters.

 The plurality also appears to have found that the National Prohibition Act contained a clear statement of intent to reach foreign-flag vessels, because the Act had been amended to state that it applied to “all territory subject to [the] jurisdiction” of the United States. Cunard S. S. Co. v. Mellon, 262 U. S. 100, 127 (1923) (internal quotation marks omitted).

 The plurality intimates that the clear-statement rule might be inapplicable in situations where, as here, the foreign-flag ships have a number of contacts with the United States. See ante, at 131-132. McCulloch, 372 U. S., at 19, expressly rejected this approach, explaining that any attempt to weigh the ship’s contacts with the United States “would inevitably lead *151 to embarrassment in foreign affairs and [would] be entirely infeasible in actual practice.”

 This is by no means clear. Title III defines “readily achievable” as “easily accomplishable and able to be carried out without much difficulty or expense.” 42 U. S. C. § 12181(9). It is, at best, ambiguous whether a barrier removal can be rendered not “easily accomplishable” or not “able to be carried out without much difficulty” by factors extrinsic to the removal itself Conflict of an easily altered structure with foreign laws seems to me not much different from the tendency of an easily altered structure to deter customers. That is why, as suggested in text, the Court’s unexpected Title III holding may be the most significant aspect of today’s foreign-flag decision.

 The Court, of course, has not even shown that Title III is consistent with the laws of the cruise ships’ flag state; much less has it undertaken the Herculean task — which its theory of presumed coverage by domestic law would require — of showing Title III consistent with the laws of all the cruise ships’ ports of call.

 Of course this dear-statement rule would not apply to the onshore operations of foreign cruise companies, which would be treated no differently from the operations of other foreign companies on American soil.

 This includes the priring and ticketing policies, which are intimately related to the ships’ maritime operations (and perhaps to internal order) because they are designed to defray the added cost and provide the added protection that the cruise-ship companies deem necessary for safe transport of disabled passengers.

 The plurality’s discussion of Longshoremen v. Ariadne Shipping Co., 397 U. S. 195 (1970), is misleading. Although Ariadne clearly recognized the existence of an internal-order rule in our case law, see id., at 200, Ariadne did not hold, similarly to what the plurality holds here, that application of the foreign-flag dear-statement rule prevented some provisions of the National Labor Relations Act (NLRA) from being applied to foreign-flag ships but allowed others to be applied. Rather, it held that the clear-statement rule did not apply at all to activities that were not “within the ‘maritime operations of foreign-flag ships.’ ” Ibid. The case *157 is relevant only to questions the Court does not decide here — namely, application of Title III to onshore operations of the foreign-flag ships. It is not relevant to the question whether all maritime activities are exempt from Title III for lack of a clear statement.

 The plurality attempts to simplify this inquiry by explaining that, if it is “a difficult question whether a particular Title III barrier-removal requirement is readily achievable, but the requirement does entail a permanent and significant structural modification, interfering with a foreign ship’s internal affairs[,] a court sensibly could invoke the clear statement rule without determining whether Title III actually imposes the requirement.” Ante, at 137. It is impossible to reconcile this with the plurality's rationale, which excludes the clear-statement rule when there is no actual conflict with foreign law. On the plurality’s own analysis, significant structural modifications are least likely to pose an actual conflict with foreign, law, since they are most likely to be regarded as (under the plurality’s new Title III jurisprudence) not “readily achievable” and hence not required. I am at a loss to understand what the plurality has in mind.

 After this Court concluded, in EEOC v. Arabian American Oil Co., 499 U. S. 244, 260 (1991) (ARAMCO), that Title VII of the Civil Rights Act of 1964 does not protect American citizens working for American employers in foreign countries, Congress amended Title VII. Unlike what would have been this Court’s only available resolution of the issue had it *159 come to the opposite conclusion in ARAMCO — that Title VII applies to all American employers operating abroad — Congress was able to craft a more nuanced solution by exempting employers if compliance with Title VII would run afoul of the law in the country where the workplace was located. See 42 U. S. C. §2000e-1(b); cf. § 12112(c)(1) (same disposition for Title I of the ADA).